# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

HENRY O. TYLER                                                              PLAINTIFF

v.                                    Case No. 4:08CV00583 JLH

UNIVERSITY OF ARKANSAS
BOARD OF TRUSTEES and
DR. STEPHANIE GARDNER                                                       DEFENDANTS

## OPINION AND ORDER

Henry Tyler commenced this action against the University of Arkansas Board of Trustees and

Dr. Stephanie Gardner, individually, alleging sex discrimination and retaliation in violation of Title

VII and 42 U.S.C. §§ 1981 and 1983. The defendants have filed a motion for summary judgment,

to which Tyler has responded. For the following reasons, the motion for summary judgment is

granted.

## I.

A court should enter summary judgment when "the pleadings, the discovery and disclosure

materials on file, and any affidavits show that there is no genuine issue as to any material fact and

that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986). When

a nonmoving party cannot make an adequate showing on a necessary element of the case on which

that party bears the burden of proof, the moving party is entitled to judgment as a matter of law.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The

moving party bears the initial responsibility of demonstrating the absence of a genuine issue of

material fact. *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553. If the moving party meets this burden,

"the nonmoving party must come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986) (quoting FED. R. CIV. P. 56(e)).  A genuine issue for trial exists only if there is sufficient evidence to allow a jury to return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  In deciding a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party and draws all inferences in his favor, mindful that summary judgment seldom should be granted in discrimination cases where claims are often based on inferences. *Peterson v. Scott County*, 406 F.3d 515, 520 (8th Cir. 2005); *Bassett v. City of Minneapolis*, 211 F.3d 1097, 1099 (8th Cir. 2000) (collecting cases). *But see Bainbridge v. Loffredo Gardens, Inc.*, 378 F.3d 756, 762 (8th Cir. 2004) (Arnold, J., dissenting).

## II.

Henry Tyler, an African American, works as a minority student recruiter for the College of Pharmacy at the University of Arkansas for Medical Sciences ("UAMS").  UAMS is comprised of six academic colleges: the College of Medicine, the College of Pharmacy**,** the College of Health Related Professions (CHRP), the College of Nursing, the College of Public Health, and the College of Graduate Programs.  The Colleges of Medicine and Pharmacy have recruiters whose job it is to target minority students for application—Bill Bauknight is the minority recruiter for the College of Medicine, and Tyler for the College of Pharmacy.  Tyler has held that position since 1981.

In 2004, Tyler filed a lawsuit—not the instant action—against the University Board of Trustees and other UAMS officials, including Dr. Gardner.  In that suit, Tyler alleged that he was paid differently from similarly situated white employees because of race discrimination and retaliation.  In October 2005, Tyler entered into a settlement agreement with UAMS officials and

the Board of Trustees, bringing an end to that lawsuit. As a part of the settlement agreement, the parties agreed to the job duties and responsibilities expected of Tyler in his position as Assistant Dean for Diversity in the College of Pharmacy. The agreed-upon job description stated that Tyler was to spend 75% of his time developing, coordinating, and directing recruitment activities—including traveling to recruiting fairs and conferences—in order to increase minority representation in the College of Pharmacy. His remaining time was to be spent maintaining statewide contacts, serving on UAMS committees, and working with student organizations. The agreement further states:

> 7.    The parties understand and agree that UAMS has for some time been exploring the creation of a campus-wide Office of Diversity, to be supervised by a Director of Diversity. The parties further understand and agree that if such Office of Diversity is implemented, it is possible that Plaintiff and others at UAMS who currently perform minority recruiting or diversity functions may be transferred from their current colleges or units to the Office of Diversity, may then be directly supervised by the Director of Diversity, and may have their current titles and/or specific job responsibilities appropriately altered. The parties agree that in the event Plaintiff's job position is moved from the College of Pharmacy to an Office of Diversity, this shall have no negative impact on his current salary or benefits.

The defendants agreed that Tyler would not be discriminated or retaliated against for his having brought the lawsuit, his preceding EEOC Charge, his internal grievance, or in any other manner asserting his claim of wage discrimination.

As indicated in the settlement agreement, prior to the agreement's finalization the College of Medicine had been conducting a search for a new position: Director of Diversity Recruitment. Dr. Albert Reece, Dean of the College of Medicine, and Dr. Gardner, then Interim Dean of the College of Pharmacy, were concerned about minority recruiting and enrollment in their respective colleges, and hiring a Director of Diversity Recruitment was in part a reaction to those concerns.

Once finalized, the official job posting required applicants to have a Ph.D. or equivalent terminal degree, experience in recruiting minority students, and a successful track record of writing grant applications. The search resulted in two finalists, Dr. Brown and Dr. Landefeld. Although Landefeld was determined to be the top candidate, he ultimately was not selected,[1] and the search was closed sometime in 2006.

Dr. Reece subsequently left UAMS, to be replaced by Dr. Debra Fiser as Dean of the College of Medicine. Sometime later in 2006, the deans—including Dr. Ron Winters, Fiser, Gardner, and UAMS Vice Chancellor Tom Butler—again started discussions on the need for a Director of Diversity position and how to go about filling it. At some point in those discussions, Dr. Winters suggested former State Representative Joyce Elliott as someone with significant experience in public service, education, and minority issues, and who knew the state well.[2] As a member of the Legislative Black Caucus, Elliott had also previously worked with both Vice Chancellor Butler and Gardner on how the Caucus could help UAMS improve minority recruitment and representation.

As a result of those discussions, Butler agreed to contact Elliott. He discussed with her his disappointment over not having hired someone for Director of Diversity Recruitment and the need to hire someone with her experience and passion, and he asked whether she would be interested in the position of Director of Diversity should it be created. Although she was not formally offered the

---

[1]Affidavits from Ronald Winters (Dean of CHRP) and Robert McGehee (professor in the College of Medicine), both members of the Council of Deans, indicate that Landefeld was not selected based in part on concerns about the bizarre and unprofessional manner of his attire and how that might affect his ability to be accessible to communities throughout the state.

[2]Dr. Winters had recently heard Elliott give a commencement address at his child's high school graduation. He was impressed with her speech and knew Elliott to be involved in minority education issues.

position, Elliott decided that she would not be able to accept it even if offered, since she was planning to run for State Senate. Butler asked whether Elliott might recommend anyone else, and she suggested that UAMS contact Vivian Flowers.

At that time, Vivian Flowers was about to complete her Masters in Public Service at the Clinton School of Public Service. Elliott said she thought Flowers was knowledgeable and imminently qualified for the job. Butler contacted Flowers, who had several informal discussions with UAMS officials before informally meeting with the Council of Deans on December 20, 2006, to discuss possible employment opportunities.[3] Although not told to do so, Flowers brought copies of her resume and some personal notes. They discussed her background, work experience, long term goals, and experience at the Clinton School, as well as issues relating to minority recruitment. She was not offered a job, and Butler says he told her in advance that the meeting was not a formal job interview and that no job offer would result from it. Subsequent to the interview, Flowers had three persons submit letters of recommendation to Dr. Dodd Wilson, Chancellor of UAMS, who in turn sent them to the Council of Deans.

The Council then decided to create and formally advertise the position of "Director of Recruitment for Diversity" and to conduct interviews. The personnel requisition form, dated January 24, 2007, described the Director's primary responsibility as follows:

> [T]o coordinate and strengthen the diversity recruitment activities for the participating Colleges on the UAMS campus. . . . Each participating College currently has recruitment activities on-going, but there is a need for coordination of these efforts to improve efficiency and decrease redundancy. The position will be housed in the [College of Medicine] with direct reporting to Dr. Wheeler but will have responsibilities for all student diversity recruiting, except for the [College of

---

[3]As of December 20, 2006, UAMS had not posted an official job opening for a director of diversity or related position.

Public Health], and will report to the Council of Deans.

The requisition form stated that the Director would directly supervise the activities of Bauknight in the College of Medicine and Tyler in the College of Pharmacy "relative to organizing and coordinating student recruiting activities and events." The attached description of qualifications stated:

> The successful applicant will have earned a master's degree; a Ph.D. or equivalent terminal degree is desirable, and he or she will have current knowledge of issues related to diversity and equity or relevant experience. The candidate should have excellent communication and interpersonal skills, experience dealing with a university academic and administrative community, and a demonstrated ability to work with faculty and students from diverse backgrounds. An individual with a successful track record of writing grant applications is desirable.

On January 25, 2007, UAMS officially posted the position on-line through its Office of Human Resources. The job description in the job posting is largely similar to that in the personnel requisition form, except that the job posting listed by the Office of Human Resources states: "Master degree plus 3 years experience with student recruiting and current knowledge of issues related to diversity and equity. Ph.D. desirable." Vice Chancellor Butler had informed Flowers that the position would be formally posted, and Flowers applied on-line that same day.

Henry Tyler asserts that Gardner, his immediate supervisor, had known for some time of his interest in receiving a promotion within the UAMS system. Although no one directly informed Tyler of the posting of the Director of Recruitment for Diversity position on January 25, Tyler's weekly employment report indicates that he met with Gardner regarding the position on February 2, 2007. According to that report, which Tyler authored, he and Gardner discussed the recruitment of a Director of Diversity who would coordinate recruiting efforts and would work out of the Chancellor's office. Tyler's report to Gardner stated that he would gather additional information on

the position, and, if it had not been filled, he would be interested in submitting his application for the position. His report goes on to give reasons why he thinks his application should be given serious consideration. One week later, on February 9, Tyler had yet to apply, and Gardner told him that the Council of Deans was meeting that day regarding interviews for the position.[4] By email, Tyler informed Gardner that he was interested in the position and planned to apply, but was not able to do so on such short notice. He applied later that day.

In their February 9 meeting, the Council of Deans decided to interview five candidates, including Flowers and Tyler. Three of the five interviewees were male. After completing those interviews, the Council hired Flowers, determining that she was the best qualified for the position.[5] Flowers started work near the end of February 2007. As Director of Recruitment for Diversity, Flowers is the direct supervisor of the minority student recruiters for the Colleges of Pharmacy (Tyler) and Medicine (Bauknight).

## III.

On June 27, 2007, Tyler filed an EEOC charge, alleging that UAMS officials refused to hire him in retaliation for his earlier lawsuit. On September 24, 2008, he filed an amended complaint in which he asserts a Title VII retaliation claim against the UAMS Board of Trustees, and § 1981 and 1983 claims of retaliation and gender discrimination against Dr. Gardner individually. Tyler says the hiring of Flowers instead of him and placing her in a supervisory position over him are adverse employment actions. The defendants have filed motions for summary judgment as to the respective

[4]Gardner says that she told Tyler that the Council was already scheduling interviews and that he needed to submit his information quickly if he wanted to apply.

[5] Affidavits from Dr. Winters and Dr. McGehee indicate that the Council ranked Tyler at best as the third most qualified out of the five candidates interviewed.

claims made against them.

## A. TITLE VII RETALIATION

In analyzing Tyler's Title VII retaliation[6] claim against the UAMS Board of Trustees, the Court employs the familiar *McDonnell Douglas* burden-shifting framework. A plaintiff must establish a prima facie case of retaliation by showing that: "(1) he engaged in protected conduct by either opposing an act of discrimination made unlawful by Title VII or participating in an investigation under Title VII; (2) he suffered an adverse employment action; and (3) the adverse action was causally linked to the protected conduct." *Arraleh v. County of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006). If the plaintiff makes a prima facie showing, then "a presumption of retaliation arises, and the burden of production shifts to the employer to advance a legitimate reason for the employment action." *Recio v. Creighton Univ.*, 521 F.3d 934, 939 (8th Cir. 2008). If the employer proffers a legitimate reason, then the burden shifts back to the plaintiff to demonstrate that the proffered reason is mere pretext for illegal retaliation. *Shanklin v. Fitzgerald*, 397 F.3d 596, 603-04 (8th Cir. 2005). The ultimate burden of persuasion remains with the employee to show that the adverse employment action was motivated by intentional retaliation. *Recio*, 521 F.3d at 939.

### 1. *Prima Facie Case*

To establish his prima facie case against the Board of Trustees, Tyler must show that his not being hired as Director of Recruitment for Diversity in early 2007 was caused by the filing of his

---

[6]Tyler's EEOC charge alleges only retaliation, not gender discrimination. Thus, he has not exhausted his administrative remedies with respect to a Title VII gender discrimination claim against the Board of Trustees. *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 223 (8th Cir. 1994) (holding that the district court did not err in granting summary judgment on the plaintiff's Title VII race discrimination claim where her EEOC charge alleged only retaliation, not race discrimination).

EEOC charge and lawsuit in 2004.  Tyler has not demonstrated that causal connection.

Rarely can the mere coincidence of timing be sufficient to establish a causal connection in a retaliation case.  *See Nelson v. J.C. Penney Co., Inc.*, 75 F.3d 343, 346-47 (8th Cir. 1996).  More than just a temporal connection between the protected conduct and the adverse action is required to present a genuine factual issue on retaliation.  *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999).  Tyler filed his EEOC charge in March 2004 and his related lawsuit in September 2004, alleging pay disparity because of his race.  In October 2005, he settled that lawsuit.  The alleged adverse employment action—the hiring of Flowers instead of Tyler—occurred in February 2007, which is sixteen months after the settlement agreement, nearly two and one-half years after the filing of his lawsuit, and nearly three years after he filed his EEOC charge.  Even if the evidence showed that the Council of Deans preselected Flowers, as Tyler alleges,  Vice Chancellor Butler did not contact her until sometime in the fall of 2006, and she met with the Council of Deans in December 2006.  Thus, even if Flowers was preselected, the temporal gap remains significant. Because of the significant gap, Tyler cannot rely solely on the temporal proximity of the allegedly adverse action to establish causation.[7]  *See Lewis v. Jacks*, 486 F.3d 1025, 1029 (8th Cir. 2007) (gap

---

[7]In his responsive brief, Tyler says that his assistance of Kim Eason—an African American pharmacy student with a grievance against Gardner—in July 2006 was within seven months of Flowers's hiring.  Tyler says that Gardner thereafter discredited his work performance and alleges, without supporting evidence, that she developed a plan to deny him promotion. Gardner was not the sole decision maker in hiring Flowers.  Even if she had some influence with the Council of Deans, neither Tyler's complaint nor his EEOC charge alleges that his assistance of Eason was a protected activity for which he suffered retaliation, and his response brief alleges only that "[Gardner's] discomfort with Tyler was exacerbated" by his assistance of Eason.  Even if his assistance of Eason had been alleged as a protected activity, the seven month gap remains insufficient to show causation.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 1510, 149 L. Ed. 2d 509 (2001) (citing cases in which three and four month gaps were insufficient to establish a causal link).

of more than two years dispelled any inference of causal connection); *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 859 (8th Cir. 2005) (gap of nearly one year "is insufficient to show, and in fact weakens the showing of, the required causal link"); *Krough v. Cessford Constr. Co.*, 336 F.3d 710, 712 (8th Cir. 2003) (gap of nine months weakened any inference of retaliation); *Kipp v. Missouri Highway and Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002) ("[T]he interval of two months between the complaint and [the plaintiff's] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that the temporal connection could not justify a finding in [the plaintiff's] favor on the matter of causal link."); *Sims v. Sauer-Sundstrand Co.*, 130 F.3d 341, 344 (8th Cir. 1997) (gap of more than two years insufficient to prove causal connection).

Tyler argues that to show causation, he only needs to establish that UAMS officials were aware of his earlier lawsuit, but that is an incorrect statement of the law. Without temporal proximity establishing a causal connection, Tyler must present evidence that his earlier lawsuit or involvement in some other protected activity was a motivating factor in the Council of Deans' decision not to hire him as Director of Recruitment for Diversity. *Jackson v. Missouri Pacific R. Co.*, 803 F.2d 401, 407 (8th Cir. 1986). Although some members of the Council of Deans—including Winters, McGehee, and Wheeler—testified that they were generally aware of the fact that Tyler had previously filed and settled a lawsuit against UAMS, they also testified that they had no knowledge of the details of that lawsuit or settlement, and that any knowledge they did have had no impact on their hiring decision. None of the members of the Council were involved as defendants or otherwise in Tyler's 2004 lawsuit or settlement agreement. Tyler has presented no evidence that members of the Council had knowledge of the details of his earlier lawsuit or were in any way motivated by that lawsuit when they hired Flowers instead of him. Conclusory allegations

cannot support a claim of retaliation. *Feltmann v. Sieben*, 108 F.3d 970, 976 (8th Cir. 1997).

### 2. *Pretext*

Even if Tyler had provided evidence of causation or retaliatory animus sufficient to make a prima facie case, he has not shown that the Board of Trustees' stated reason for hiring Flowers is mere pretext for retaliation against him. Had Tyler made a prima facie case, then a presumption of retaliation would have arisen, and the burden would be on the Board of Trustees to proffer a legitimate, nondiscriminatory reason for not hiring Tyler. The Board of Trustees has proffered that they did not hire Tyler because another candidate, Flowers, was more qualified for the position of Director of Recruitment for Diversity. That is a legitimate, nondiscriminatory reason, unrelated to Tyler's previous lawsuit or EEOC charge, for not hiring him. The burden shifts to Tyler to demonstrate that the stated reason is mere pretext. *Shanklin*, 397 F.3d at 603-04.

### a. Preselection

Tyler argues that the proffered reason is pretext because the Council of Deans preselected Flowers for the position. Preselection generally means favoritism toward one or more candidates and may involve giving a favored employee some kind of competitive advantage. *McIntosh v. Weinberger*, 810 F.2d 1411, 1419 n.2 (8th Cir. 1987) (vacated on other grounds). Evidence that an employer preselected a candidate may discredit the employer's proffered hiring explanation. *See Coble v. Hot Springs Sch. Dist. No. 6*, 682 F.2d 721, 729 (8th Cir. 1982). However, preselection does not in itself amount to illegal discrimination against the disfavored employee. *McIntosh*, 810 F.2d at 1419 n.2.

Tyler states that preselection "may operate as direct evidence of discriminatory or retaliatory intent," citing in support *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed.

2d 407 (1993) and *Goostree v. Tennessee*, 796 F.2d 854 (6th Cir. 1986). *Hicks* does not discuss

preselection. In *Goostree*, a sex discrimination case, the Sixth Circuit cited *Coble* in noting that

evidence of preselection may discredit an employer's proffered explanation for its employment

decision. The *Goostree* court went on to state that "[p]reselection, of course, does not violate Title

VII when such preselection is based on the qualifications of the preselected party and not on some

basis prohibited by Title VII. However, preselection is relevant evidence of the employer's

motivation." *Goostree*, 796 F.2d at 861 (internal citation omitted). In that case, the Sixth Circuit

held that although evidence of preselection placed serious doubt on the credibility and legitimacy

of the selection committee's proffered reasons, there was little evidence from which to conclude that

sex was the basis for the preferential treatment. *Id.* at 862 ("The defendants are not subject to

liability on a Title VII claim if they hired [the preselectee] based on such criteria not prohibited by

Title VII.").

Tyler also states that "direct proof of intent is not required," citing in support *Missouri Nat'l

Educ. Ass'n v. New Madrid Cty. R-1 Enlarged Sch. Dist.*, 810 F.2d 164 (8th Cir. 1987). That case,

which involved free speech and association claims, is completely off point. There, the Eighth Circuit

held that the district court should have given a jury instruction dealing with the distinction between

direct and circumstantial evidence, as it would have aided the jury's understanding that a "motive,

intent, or design to violate a person's constitutional rights, if it exists, is seldom admitted and may

be inferred from the existence of other facts." *Missouri Nat'l Educ. Ass'n*, 810 F.2d at 167.

Finally, Tyler attempts to distinguish *Brandt v. Shop 'N Save Warehouse Foods, Inc.*, 108

F.3d 935 (8th Cir. 1997), a case relied on by the UAMS Board of Trustees. That case was an appeal

from a district court's denial of a motion for judgment as a matter of law, following a jury verdict

in favor of the plaintiff.  The plaintiff sued her employer for sex discrimination, alleging that the successful male applicant, Frentzel, was preselected.  The evidence showed that Frentzel took advantage of his "network" to land the position, and that one of the decision makers, Dougherty, obliged his friend by supporting his application, if not creating a tailor-made position for him.[8] *Brandt*, 108 F.3d at 938.  The Eighth Circuit was persuaded that Shop 'N Save's proffered reason—that the plaintiff was not qualified—was a fabrication and mere pretext for its true reason for not hiring the plaintiff: Shop 'N Save wanted to hire Frentzel, created the position specifically for him, and tailored the qualifications to match his application.  However, even though there was evidence of pretext, "it [was] not intentional sex discrimination for Dougherty to hire an unemployed old friend who happens to be male, without considering an applicant who is neither unemployed nor an old friend and happens to be female. . . . No reasonable jury could have found that Frentzel was hired to the exclusion of [the plaintiff] because [the plaintiff] was female." *Id.* at 938-39.  As *Brandt* demonstrates, even if Tyler could show that the Council of Deans preselected Flowers for the position, he would still have to show that they did so out of intentional retaliation for his prior lawsuit.

The evidence supporting Tyler's contention of preselection is thin at best.  All the evidence shows is that, based on the recommendation of Joyce Elliott, Butler informally contacted Flowers about her level of interest in working as the Director of Recruitment for Diversity, should the

---

[8]The position, an apprentice meat cutter, was newly created after Frentzel had contacted Dougherty, a friend, and sought any employment opportunity available.  The employer did not search for active files of potential applicants, did not post or advertise the job, and only interviewed and considered Frentzel.  Unlike him, the female plaintiff had extensive meat experience working for Shop 'N Save and other stores on an as needed basis, and had previously sought employment with the Shop 'N Save as an apprentice meat cutter.

position be created.  Unlike in *Brandt*, there is no evidence here that the position was created specifically for Flowers.  If anything, the evidence confirms that UAMS had envisioned some kind of director of diversity position for a period of time before Elliott recommended or anyone on the Council of Deans spoke with Vivian Flowers.  Tyler's 2005 settlement agreement explicitly references UAMS's desire to create and fill such a position; there was a search effort that failed in 2006; and the Council only contacted Flowers after having discussed the idea of the position with Elliott.

When the Council, through Butler, finally did contact Flowers, there is no evidence that their discussions were anything other than informal.  No job offer was extended.  The job title and duties had yet to be finalized.  Flowers did not sit down for a formal interview until after the position had been formally posted and advertised.  That Flowers was informed of when the position would be advertised was not a "competitive advantage," *McIntosh*, 810 F.2d at 1419 n.2,  as the posting was open to the public.  Even if it was a competitive advantage over the general population, it could not be considered a serious competitive advantage over Tyler, who was already working at UAMS on minority matters, had expressed interest in a promotion, and whose daily personal interaction with UAMS officials afforded him the opportunity to learn of the posting date, had he taken the initiative.

Tyler alleges, with no supporting evidence, that the Council waited until Flowers had completed her Masers degree before officially posting the job.  The evidence does not support that assertion.  Butler was informally discussing the position with Elliott in 2006, and at some point she recommended that Butler contact Flowers.  After some informal discussions with Butler, Flowers did not informally meet with members of the Council of Deans until December 2006, the same

month in which she received her Masters degree.[9]

Tyler says that the Council had predetermined that he would not be hired as Director because the requisition form stated that the Director would supervise him and Bauknight. The only conclusion that can reasonably be drawn from the requisition form is that the Council had predetermined that the Director would directly supervise whoever was in charge of minority recruiting for the Colleges of Medicine and Pharmacy. Tyler was given the opportunity to formally apply for the position; in fact, he was reminded and encouraged to do so by Gardner. Tyler was one of five applicants interviewed. Only after completion of the interviews did the Council of Deans finally select Flowers. There is also no evidence that Tyler was asked about his prior lawsuit during the interview, or that the deans' general knowledge about the lawsuit played any part in their review of his application or conduct of his interview. Therefore, here, as in *Brandt* and *Goostree*, even if Tyler could show that the Council preselected Flowers, he has put forth no evidence showing that the Council intentionally chose not to hire him out of retaliation for his earlier lawsuit.

Tyler cannot support his retaliation claim based solely on conclusory allegations of the Council's intentions, especially at the pretext stage. A plaintiff need not necessarily provide evidence "showing" discriminatory animus directly, where other evidence supports an inference of discriminatory animus. *Dixon v. Pulaski Cty. Special Sch. Dist.*, 578 F.3d 862, 872 (8th Cir. 2009). Here, however, Tyler has not offered sufficient evidence for a reasonable jury to conclude that

---

[9]Tyler also argues that Flowers did not meet one of the minimum requirements listed in the official job posting: 3 years experience in minority recruiting. It makes no sense that the Council would delay posting the job so that Flowers could meet the requirement of having a Masters degree, only to then post a job for which Flowers was not minimally qualified. If the Council engaged in a conspiracy to delay the job posting until Flowers received her Masters so that she met the minimum education qualifications, it stands to reason that the Council would also ensure that Flowers met the other minimum qualifications.

Flowers was preselected—or that even if she was preselected, the Council's decision not to hire him was motivated out of retaliation for his earlier lawsuit.

### b. Qualifications

Tyler also argues that the Board of Trustees' proffered reason is factually incorrect and falsely given because he was more qualified than Flowers, who did not meet one of the advertised minimum qualifications for the position. Although an employer's misjudgment as to whether an applicant has the required qualifications does not invalidate the resulting proffered reason, misjudgment of an employee's qualifications may be probative of whether the stated reason is mere pretext for discrimination. *Dixon*, 578 F.3d at 868 (citing *Dionne v. Shalala*, 209 F.3d 705, 709 (8th Cir. 2000) and *O'Connor v. Peru State Coll.*, 781 F.2d 632, 637 (8th Cir. 1986)). Falsity of a proffered reason can be evidence of pretext. *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147-48, 120 S. Ct. 2097, 2108-09, 147 L. Ed. 2d 105 (2000). However, "'pretext' . . . often must be read as shorthand for indicating that a defendant's proffered . . . explanation . . . is a pretext *for unlawful discrimination*, not that it is merely false in some way." *Strate v. Midwest Bankcentre, Inc.*, 398 F.3d 1011, 1017 (8th Cir. 2005); *see also Dixon*, 578 F.3d at 872 ("[N]ot any showing of pretext is enough. The pretext must be pretext *for discrimination*. A reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").

The evidence in this case does not support Tyler's contention that the Board of Trustees' articulated reason is falsely given. The essential question is not whether Flowers was actually more qualified than Tyler, nor is it whether Flowers actually failed to meet the advertised minimum qualifications—rather, the essential question is whether the Council of Deans honestly believed that

Flowers met the minimum qualifications and was more qualified than Tyler for the position of Director of Recruitment for Diversity. *See Johnson v. AT&T Corp.*, 422 F.3d 756, 762-63 (8th Cir. 2005); *Hitt v. Harsco Corp.*, 356 F.3d 920, 924 (8th Cir. 2004); *Scroggins v. Univ. of Minnesota*, 221 F.3d 1042, 1045 (8th Cir. 2000).

Tyler asserts that Dr. Gardner plotted a scheme to defeat his efforts at a promotion, including critiquing his job performance in the College of Pharmacy. Tyler says that Gardner communicated her concerns over his poor work performance to members of the Council of Deans, costing him the position of Director of Recruitment for Diversity. Tyler also says that Gardner admitted in deposition testimony that Flowers was not the ideal candidate.

Gardner was only peripherally relevant to Flowers's hiring: she was not a member of the Council of Deans, and although she was involved with the hiring process, she was not the sole decision maker in the hiring of Flowers. Still, Tyler's allegations remain conclusory—there is no evidence in the record from which a reasonable jury could conclude that Gardner hatched a scheme to deny Tyler the position. Although Gardner stated that Flowers was not the ideal candidate, that statement was made in the context of being questioned about whether the ideal candidate would have recruiting experience, and in no way implied that Tyler was thus the ideal candidate. It is reasonable that no applicant may fit the mold of the perfectly ideal candidate; it does not follow that Flowers was thus unqualified.

There is documentation in the record that Gardner was concerned that Tyler was failing to meet minority recruiting goals. In an email dated November 6, 2006, Gardner reminded Tyler that the College of Pharmacy's goal was to recruit twenty *competitive* minority applicants, not just to recruit twenty minority students to apply for the College of Pharmacy as Tyler had done. In a letter

17

dated October 10, 2006, Gardner expressed to Tyler her concerns over his not spending significant time outside the College, his apparent inactivity while at work, and his lack of attendance at a recruiting event. Even if communicated to the Council of Deans, nothing about that evidence shows that Gardner was anything but honestly concerned about Tyler's poor work performance.

Similarly, the evidence shows that the Council of Deans honestly believed that Flowers met the minimum qualifications. Tyler relies significantly on the discrepancy between the job descriptions in the personnel requisition form and the on-line posting. The on-line job description posted by UAMS's Office of Human Resources listed an additional requirement not found in the original job description: 3 years experience in minority recruiting. That is a discrepancy without any real difference. There is no evidence that Gardner or any member of the Council of Deans intentionally altered the job description to include the recruiting experience requirement. And even if they had done so, it would make no sense, as Tyler tries to argue, that the Council of Deans would tailor a job description to fit the qualifications of their preselectee, Flowers, and then change that job description to include a minimum requirement that the preselectee did not have. The deposition testimony and supporting affidavits from members of the Council of Deans shows that none of them considered the Director of Recruitment for Diversity position to be one that required experience in recruiting, or that would involve actual recruiting. Rather, the evidence shows that the Council of Deans envisioned the Director position as simply that: a director who would oversee, coordinate, and manage those involved in minority recruiting for particular colleges within UAMS. Thus, the evidence shows that the Council of Deans honestly believed that Flowers met the minimum qualifications for the job.

Finally, the evidence shows that the Council of Deans honestly believed that Flowers was

more qualified than Tyler. Flowers received her undergraduate degree in Political Science and Rhetoric and Writing in 2005, and her Masters in Political Science from the Clinton School of Public Service in December 2006. She had significant experience in state politics, and the Council of Deans wanted someone with experience working with education and government leaders around the state. Flowers worked for several years at the University of Arkansas's Division of Agriculture, for four years on the Committee Staff for the Arkansas Bureau of Legislative Research, and for eight years as the Executive Director of the Arkansas Legislative Black Caucus. In addition, she had been a member of the Arkansas Minority Health Commission for over six years and of Common Cause for eight years, and had experience in writing grant proposals. The Council members present for her official interview were impressed with her competence, enthusiasm, and vision for the Director position.

On the other hand, Tyler has an undergraduate degree in Psychology and a Masters in Counseling, obtained in 1977. He had over 25 years experience working in recruiting, which experience the Council of Deans considered to be a "plus" but not essential to the Director position. He had no grant writing experience. Dr. McGehee testified that Tyler's interview was lackluster at best. Both McGehee and Winters testified that they were less than impressed with Tyler's overall body of work in minority recruiting for the College of Pharmacy, and those impressions were not based just on Gardner's employment reviews.

Whether the Council's determination was correct is not within the purview of the Court's analysis; whether the evidence shows that the Council honestly believed Flowers more qualified is the only issue. *Scroggins*, 221 F.3d at 1045. The evidence shows that the Council of Deans honestly believed that Flowers was more qualified than Tyler to do the work that was required of the Director

of Recruitment for Diversity. As with Tyler's arguments on preselection, even if he could show that the Board of Trustees' stated reason is pretext because it is false, there is no evidence to support Tyler's contention that it is pretext *for discrimination* based in retaliation. At best, the evidence shows that the proffered reason is pretext for the Council's desire to hire Flowers. As the Court has discussed, even if the evidence supported Tyler's assertion of preselection, it does not support a showing of pretext *for discrimination*.

## B.   SECTION 1983 RETALIATION AND SEX DISCRIMINATION

Tyler asserts sex discrimination and retaliation claims against Gardner individually pursuant to 42 U.S.C. § 1983.[10] Tyler fails to present sufficient evidence to establish either of those legal claims against Gardner in her individual capacity.[11]

### 1.   *Retaliation*

As the Court has already discussed at length, Tyler has not presented sufficient evidence to establish that Gardner or the Council of Deans refused to hire him as Director of Recruitment for Diversity out of retaliation for his previous EEOC charge and lawsuit. For the same reasons that Tyler's Title VII retaliation claim against the UAMS Board of Trustees failed, his § 1983 retaliation

---

[10]Tyler's complaint also asserts a claim against Gardner under 42 U.S.C. § 1981. That section, however, is relevant only to claims of race discrimination, and Tyler's claims against Gardner are based only on sex discrimination and retaliation for having previously filed a lawsuit, albeit one in which Tyler made allegations of pay disparity because of his race.

[11]Gardner also argues that she is protected from Tyler's claim by the doctrine of qualified immunity. "Qualified immunity shields government officials performing discretionary functions from liability for civil damages unless their conduct violates clearly established statutory or constitutional rights of which a reasonable person would have known." *Thomas v. Hungerford*, 23 F.3d 1450, 1452 (8th Cir. 1994). Because the Court grants summary judgment in favor of Gardner on the merits of Tyler's § 1983 claims, the Court need not reach a conclusion on whether she is shielded by qualified immunity.

claim against Gardner for his non-hiring also fails.

Tyler does allege one basis of retaliation that is unique to Gardner: Tyler's assistance of Kim Eason with her grievance against Gardner. Tyler says that sometime in the spring of 2006 he aided Eason, an African American recruit, with a grievance regarding discrimination within the College of Pharmacy.[12] After Gardner ruled against Eason's grievance in July 2006, Tyler says she began taking adverse employment actions against him in retaliation. The alleged adverse actions include: discrediting Tyler's past work performance (whereas Tyler says that Gardner previously had no issues with his performance); requiring Tyler to submit detailed written reports on his work; moving the location of his office several times; and ceasing to evaluate his work performance.

Significantly, other than conclusorily stating that the listed adverse actions were in retaliation for the Eason incident, Tyler makes no argument as to why summary judgment should not be granted on his retaliation claim against Gardner. As the Court previously discussed, Gardner criticized Tyler's work performance for several reasons: he was not reaching the goal of recruiting twenty competitive minority applicants; he was not spending sufficient time traveling the state and maintaining contacts; it was unclear how he spent his time while on campus; and he failed to attend at least one major recruiting event. As a result of her concerns over his job performance, she began requiring that Tyler submit written reports outlining what exactly he was doing on a day-to-day basis. His office was moved twice: first from a separated room into the Dean's suite where most other Assistant and Associate College Deans were located, and then to the Center for Diversity Affairs after the creation and hiring of a Director of Recruitment for Diversity. Tyler's 2005 settlement

---

[12]The complaint makes no mention of Tyler's assistance of Eason as a motivating factor behind Gardner's alleged retaliation.

agreement even specifically states that Tyler, as minority recruiter for the College of Pharmacy, might be transferred to the Office of Diversity and directly supervised by the Director of that office. Finally, that Gardner ceased to regularly communicate with Tyler or evaluate his work at the start of 2007 was logical, since Tyler had a new direct supervisor, Vivian Flowers. Gardner has proffered legitimate, nondiscriminatory reasons for each of the alleged adverse actions, and Tyler fails to present any proof that those stated reasons are mere pretext.

### 2.    *Sex Discrimination*

Tyler also asserts against Gardner a § 1983 sex discrimination claim, which he was barred from asserting under Title VII against the UAMS Board of Trustees. Tyler presents no direct evidence of sex discrimination, so his claim is analyzed under the *McDonnell Douglas* burden shifting framework. *Wells v. SCI Management, L.P.*, 469 F.3d 697, 700 (8th Cir. 2006). Tyler must first present a prima facie case, which requires that he show that: (1) he is a member of a protected class; (2) he was qualified for the position of Director of Recruitment for Diversity; (3) he was denied the position; and (4) UAMS hired someone outside of the protected class. *See Arraleh*, 461 F.3d at 975 (citing *Kobrin v. Univ. of Minn.*, 34 F.3d 698, 702 (8th Cir. 1994)). If he does so, then Gardner may rebut the prima facie case by articulating a legitimate, nondiscriminatory reason for the decision not to hire Tyler. Her burden at this stage is not onerous. *Id.* The burden then shifts back to Tyler to demonstrate that "the proffered reason is not the true reason for the employment decision." *Id.* at 975-76 (citing *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)).

Gardner does not contest that Tyler has established a prima facie case, and she has proffered a legitimate, nondiscriminatory reason for why Tyler was not hired as Director of Recruitment for

Diversity. The burden thus rests on Tyler to show that her stated reasons are not the true reason, or that they are mere pretext.

Tyler asserts that pretext is established by the following: Flowers was less qualified than he for the position of Director of Recruitment for Diversity; the requirement of "3 years recruiting experience" was initially in the job posting and later removed and considered only a "plus"; and Gardner also supported the placement of Linda DuPuy in a position of authority over Tyler. For the same reasons that Tyler's retaliation claim failed, Gardner says his claim that he was not hired because of his sex also must fail. Gardner argues that she was not the sole decision maker on hiring Flowers[13], and that Gardner's honest desire was to select the best person for the job, and that person happened to be female.

Tyler's arguments for the existence of pretext are again unconvincing and unsupported by the evidence. First, the evidence does not show that the requirement of "3 years recruiting experience" was initially in the job posting and later removed. The evidence is that the job description composed for the Director of Recruitment for Diversity position[14] initially had no requirement of recruiting experience, and that that requirement was somehow *added to*, not removed from, the job description before its posting on UAMS's Office of Human Resources website. There is no evidence as to the cause of the mixup, much less that Gardner directly had anything to do with

[13]That Gardner was not the sole decision maker, though perhaps relevant to the weight of her influence in Flowers's hiring, is not necessarily dispositive of whether she engaged in sex discrimination against Tyler.

[14]The earlier position of Director of Diversity for which Dr. Landefeld was a finalist may have included recruiting experience as a qualification. But that search failed, and the position was abandoned sometime in early 2006. In December 2006 and January 2007, the Council of Deans began a new search for a similar position, but with a new title (Director of Recruitment for Diversity) and with an updated description of its duties and qualifications.

the change. In any event, the evidence also shows that neither Gardner nor the Council of Deans considered the Director position to be a recruiter position.

Second, Tyler fails to explain how the hiring of Linda DuPuy is relevant to pretext or any of his other claims. Tyler's claim is based on his being denied the position of Director of Recruitment for Diversity. DuPuy was hired for a completely different position, Director of Recruitment, which oversees Flowers's position, as well as that of Tyler and Bauknight. Tyler asserts that DuPuy's hiring is further evidence that the hiring of a woman, Flowers, as Director of Recruitment for Diversity was a "sham." Whether DuPuy is qualified to supervise Flowers, Tyler, and Bauknight, is irrelevant to whether Tyler was discriminated against in not being hired as the Director of Recruitment for Diversity. DuPuy was hired more than eighteen months after the creation of the Director of Recruitment for Diversity position, and her hiring does nothing to support a showing that Gardner wanted a woman to fill that position.

Finally, as the Court has previously discussed, the evidence simply does not show that Flowers was less qualified than Tyler for the duties of the Director position. The Eighth Circuit has stated:

> Although an employer's selection of a less qualified candidate can support a finding that the employer's nondiscriminatory reason for the hiring was pretextual, it is the employer's role to identify those strengths that constitute the best qualified applicant. This is so because the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.

*Kincaid v. City of Omaha*, 378 F.3d 799, 805 (8th Cir. 2004) (internal citations and quotes omitted). It is not sufficient for Tyler to show that he and Flowers were both qualified. To demonstrate pretext, he must show that Gardner and the Council of Deans hired "a *less* qualified applicant." *Id.*

at 805-06 (holding that plaintiff failed to show that the selected candidate was less, as opposed to equally, qualified).  Tyler has not done so.  No reasonable jury could conclude from the evidence before the Court that Flowers was *less* qualified than Tyler to serve as Director of Recruitment for Diversity.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is GRANTED. Document #29.  Tyler's complaint against the UAMS Board of Trustees and Dr. Stephanie Gardner is dismissed with prejudice.

IT IS SO ORDERED this 8th day of January, 2010.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE